1

2

3

4

5

6          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
7                   AT SEATTLE

8

9   NEW EDGE INTERNATIONAL, LLC, a
    New Jersey Limited Liability Company,

10                    Plaintiff,                    C08-1552Z

11  v.                                              ORDER

12  TRANS-NET, INC., a Washington
    Corporation,
13
                      Defendant.
14

15

16         THIS MATTER comes before the Court on defendant's motion for summary

17  judgment, docket no. 20.  Having reviewed all papers filed in support of and in opposition to

18  the motion, the Court GRANTS the motion.

19  **Background**

20         Plaintiff New Edge International, LLC ("NEI") is an exporter; it purchases product in

21  one location, moves it to another location, and resells the product for a profit.  Ionitsa Decl.

22  at ¶ 3 (docket no. 24).  Defendant Trans-Net, Inc. ("Trans-Net") is a Washington-based

23  company that arranges for the shipment of cargo from the United States to Russia, as well as

24  other countries.  Exh. A to Meyler Decl. (docket no. 26).  In the fall of 2007, NEI contracted

25  with Trans-Net to ship a container of frozen pork from Seattle to Petropavlovsk-Kamchatsky

26  ("P-K"), Russia.  Ogle Decl. at ¶ 2 & Exh. A (docket no. 21); *see also* Exh. A to Ionitsa

Decl. The bill of lading setting forth the agreement between NEI and Trans-Net (the "Trans-Net Bill of Lading") listed as the consignee for the frozen pork Trading Company Caravan Ltd. ("Caravan"), and it indicated that "[t]he responsibilities of the Carrier in any capacity shall altogether cease and the Goods shall be considered to be delivered and at their own risk and expense in every respect when taken into the custody of Customs or other Authorities." Bill of Lading Terms & Conditions at ¶ 15, Exh. A to Ogle Decl.; *see also* Exh. A to Ionitsa Decl. Trans-Net issued three originals of the Trans-Net Bill of Lading and sent them to NEI. Ionitsa Decl. at ¶ 5.

The container of pork arrived in P-K on December 27, 2007, aboard a vessel operated by Sakhalin Shipping Company ("SASCO"). Semenov Decl. at ¶ 2 (docket no. 22). SASCO had issued a transit bill of lading for the cargo (the "SASCO Transit Bill"), listing as consignee Transflot for Trading Company Caravan. Exh. D to Meyler Decl. Transflot is a company that served as Trans-Net's agent in P-K. Semenov Decl. at ¶ 1. When the pork was offloaded, the original SASCO Transit Bill was stamped by Russian customs officials and given to Denis Semenov, an employee of Transflot. *Id.* at ¶ 3. The container of pork was placed in a bonded storage area controlled by Russian customs officials and P-K Port authorities. Ogle Decl. at ¶ 5; *see also* Yushkin Report at 3, Exh. A to Yushkin Decl. (docket no. 25). Had all gone according to plan, Caravan, which had contracted with NEI to purchase the pork, would have received from NEI an original Trans-Net Bill of Lading, would have then been able to exchange the Trans-Net Bill of Lading for the original SASCO Transit Bill held by Mr. Semenov of Transflot, and would have used the SASCO Transit Bill, along with an authorization letter from Mr. Semenov, to obtain the container from the warehouse at the P-K Port. *See* Semenov Decl. at ¶ 4; *see also* Yushkin Report at 3.

The plan, however, went awry. While the container of pork was in route, a dispute arose between NEI and Caravan and, as a result, on December 17, 2007, NEI instructed Trans-Net not to release the pork to Caravan. Ionitsa Decl. at ¶ 7 & Exh. B. The container

of pork remained in storage at the P-K Port for almost three months, while NEI attempted to

identify another buyer.  *See* Ogle Decl. at ¶ 5; Ionitsa Decl. at ¶ 16.  Meanwhile, Trans-Net

expressed concerns to NEI about the situation, stating in an e-mail to NEI's sole member and

manager, Artem Ionitsa:

> It seems this matter is not resolving itself as quickly as expected although I am
> sure you are trying.  We are caught in the middle of this dispute between you
> and your buyer and we fear soon the matter will be taken out of our hands by
> Russian customs if the cargo is arrested.  We highly suggest you take action to
> move this cargo into bonded cold storage after payment of accrued storage and
> other destination fees.

Exh. C to Ogle Decl. (e-mail dated Feb. 13, 2008); *see also* Ionitsa Decl. at ¶ 2.

Although NEI eventually found another purchaser for the pork, and both Trans-Net

and SASCO took steps to issue the documents necessary for the new buyer to take possession

of the container, *see* Exh. A to Larchenko Decl. (docket no. 28); Ionitsa Decl. at ¶ 18, on

March 24, 2008, the container of pork was released from the P-K Port warehouse to Caravan

without presentation by Caravan of the original, stamped SASCO Transit Bill, *see* Semenov

Decl. at ¶¶ 12-13.  At the time Caravan obtained the frozen pork, Caravan had not yet

presented to Mr. Semenov an original Trans-Net Bill of Lading and had not received from

Mr. Semenov either an authorization letter or the original SASCO Transit Bill.  *Id.* at

¶¶ 10 & 12.

In October 2008, NEI initiated this action against Trans-Net, and it now alleges:

(i) violation of the Carriage of Goods by Sea Act ("COGSA"); (ii) violation of the Harter

Act; (iii) violation of the Pomerene Bills of Lading Act; and (iv) breach of contract.  First

Amended Complaint (docket no. 9).  Trans-Net moves for summary judgment as to all four

claims on the ground that, when it delivered the container of pork into the custody of Russian

customs and P-K Port officials, it had satisfied its statutory and contractual obligations.

/ / /

/ / /

ORDER - 3

1 **Discussion**

2 **A.     Summary Judgment Standard**

3     The Court should grant summary judgment if no genuine issue of material fact exists

4 and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  When

5 a properly supported motion for summary judgment has been presented, the adverse party

6 "may not rely merely on allegations or denials in its own pleading," but rather must set forth

7 "specific facts" demonstrating the existence of a genuine issue for trial.  Fed. R. Civ.

8 P. 56(e)(2).  The nonmoving party is entitled to have all "justifiable inferences" favorably

9 drawn.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  When the record,

10 however, taken as a whole, could not lead a rational trier of fact to find for the opposing

11 party, summary judgment is warranted.  *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d

12 975, 988 (9th Cir. 2006); *see also Beard v. Banks*, 548 U.S. 521, 536 (2006).

13 **B.     COGSA & The Harter Act**

14     By its own terms, COGSA applies to contracts for the carriage of goods by sea only

15 "from the time when the goods are loaded on to the time when they are discharged from the

16 ship."  COGSA § 1(e), reprinted in Revision Notes following 46 U.S.C. § 30701.  In other

17 words, COGSA governs from the time the ship's tackle is hooked onto the cargo at the port

18 of loading until the time the cargo is released from the tackle at the port of discharge, *i.e.*, the

19 "tackle-to-tackle" period.  *See Starrag v. Maersk, Inc.*, 486 F.3d 607, 612 (9th Cir. 2007).

20 COGSA limits a carrier's liability to $500 per package unless a higher maximum amount is

21 negotiated between the carrier and the shipper.  COGSA § 4(5).  Under COGSA, a shipper is

22 presented with the choice of accepting the statutory liability limitation in exchange for a

23 lower rate for shipping or declaring a higher value and paying a higher rate.  *Starrag*, 486

24 F.3d at 612.

25     In contrast, the Harter Act prohibits a carrier from inserting into a bill of lading or

26 shipping document a provision avoiding liability relating to "negligence or fault in loading,

ORDER - 4

stowage, custody, care, or proper delivery." 46 U.S.C. § 30704. This provision of the Harter Act was partially superceded by COGSA, but it still applies outside the tackle-to-tackle period, *i.e.*, prior to loading and during the time between discharge of the cargo and proper delivery. *See* *Ace Bag & Burlap Co. v. Sea-Land Serv., Inc.*, 40 F. Supp. 2d 233, 236 (D.N.J. 1999); *see also* *Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 482 (2d Cir. 1985). Under COGSA, however, the carrier and shipper may agree to extend COGSA's liability limitation beyond the tackle-to-tackle period, even to the time of delivery, and thereby render the Harter Act inapplicable. COGSA § 7; *see* *Starrag*, 486 F.3d at 612-13. In this case, the Trans-Net Bill of Lading provided that COGSA "shall be deemed to be incorporated herein" and "shall govern before loading on and after discharge from the vessel and throughout the entire time the Goods are in the custody of the Carrier." Bill of Lading Terms & Conditions at ¶ 1, Exh. A to Ionitsa Decl. This explicit language nullifies NEI's Harter Act claim. *Starrag*, 486 F.3d at 615 (when COGSA is contractually extended until delivery, the Harter Act does not apply).

In the alternative, even if NEI's Harter Act claim remained viable, the result would be the same; Trans-Net has not violated either COGSA or the Harter Act. Under both COGSA and the Harter Act, a carrier has a duty to properly deliver the cargo. COGSA § 3(2) ("The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried."); *see* 46 U.S.C. § 30704; *see also* *Seanto Exports v. United Arab Agencies*, 137 F. Supp. 2d 445, 449 (S.D.N.Y. 2001) ("the carrier retains responsibility for the cargo until 'proper delivery' has been made"). Neither statute, however, defines in express terms what constitutes proper delivery. Under maritime common law, valid delivery requires that the carrier "give due and reasonable notice to the consignee, so as to afford him a fair opportunity of providing suitable means to remove the goods, or put them under proper care and custody." *Starrag*, 486 F.3d at 617 (quoting *Richardson v. Goddard*, 64 U.S. 28, 39 (1859)). Under COGSA, delivery has been similarly defined to occur when the consignee is

ORDER - 5

notified that the goods have arrived and has been given a reasonable opportunity to obtain or inspect the goods. *Id.* at 617 & n.10. In contrast, under the Harter Act, merely discharging the cargo "upon a fit and customary wharf" has been deemed sufficient delivery. *Ace Bag*, 40 F. Supp. 2d at 237 (citing *Morse Electro Prods. Corp. v. S.S. Great Peace*, 437 F. Supp. 474, 486 (D.N.J. 1977), and *Allstate Ins. Co. v. Imparca Lines*, 646 F.2d 166, 168 (5th Cir. 1981)).

Whether delivery is proper must also be evaluated according to the custom and usage of the port of discharge. *See Ace Bag*, 40 F. Supp. 2d at 237; *see also Servicios-Expoarma, C.A. v. Indus. Mar. Carriers, Inc.*, 135 F.3d 984, 993 (5th Cir. 1998); *Tan Hi v. United States*, 94 F. Supp. 432, 435 (N.D. Cal. 1950) ("delivery must be according to the custom and usage of the port, and such delivery will discharge the carrier of his responsibility"; common law does not "permit less nor require more in the way of delivery than the usage or law of the port dictate[s]"). In this case, the parties agree that the custom and usage of the P-K Port required placement of the container of frozen pork in a bonded storage area, from which the consignee could claim the goods upon presentation of the original, customs-stamped SASCO Transit Bill. *See* Yushkin Report at 3; *see also* Semenov Decl. at ¶¶ 2-4. The parties dispute, however, whether Trans-Net continued to bear responsibility for the container after it was secured in the warehouse controlled by Russian customs and P-K Port officials.

The Court concludes that Trans-Net effected proper delivery when it relinquished to Russian authorities custody over the container of pork. In this case, Trans-Net was given explicit instructions not to deliver the cargo to the consignee, Caravan. It complied with this direction, and it notified the shipper and owner, NEI, about the container's whereabouts, expressly warned NEI about the risks of leaving the cargo in the storage facility at the P-K Port, and took the steps necessary to enable NEI's new buyer to obtain the pork. Moreover, the record before the Court establishes that neither Trans-Net nor its agent, Transflot, gave Caravan the documents usually required to retrieve cargo from the warehouse

controlled by Russian officials.[1]  Thus, to the extent Caravan improperly obtained the

container of pork,[2] the fault lies not with Trans-Net, but with the Russian storage attendants[3]

or perhaps NEI, which was provided notice and ample opportunity to remove the cargo and

place it under proper care.  The Court HOLDS as a matter of law that Trans-Net satisfied its

delivery obligations under COGSA, as well as under the Harter Act, if applicable, and

GRANTS summary judgment in favor of Trans-Net as to NEI's COGSA and Harter Act

claims, and DISMISSES NEI's first and second causes of action with prejudice.

## C.     The Pomerene Bills of Lading Act

        The Court also HOLDS as a matter of law that Trans-Net fulfilled its delivery

obligations under the Pomerene Bills of Lading Act.  Under this Act, a carrier may deliver

---

[1] Thus, this case is distinguishable from the cases cited by NEI.  For example, in *Allied*, the carrier was held liable for misdelivery because it issued to the consignee a "carta declaratoria," which allowed the consignee to obtain the cargo from a warehouse controlled by the Administration of the Port of Salvador, an agency of the Brazilian government, without producing the original bill of lading and without having paid for the goods. 775 F.2d at 479-80.  Likewise, in *Int'l Harvester*, the carrier was held liable for misdelivery when its agent issued a delivery order to the consignee without obtaining in exchange the original bill of lading, thereby assuming the risk that the consignee had not paid, and would not pay, for the goods.  695 F. Supp. at 737, 739.

[2] Caravan apparently paid for the container of frozen pork shipped to P-K, but was in arrears as to other transactions with NEI as to which Trans-Net had not been involved.  *See* Semenov Decl. at ¶ 7 & Exh. B.

[3] NEI's experts assert that, because Trans-Net was instructed to modify the shipping documents to replace I.P. Ushtykov V.A. as consignee, and because the frozen pork was released to an entity other than the substituted consignee, Trans-Net must have failed to make the requested corrections or provide the revised shipping documents to Russian officials, and therefore caused NEI's injury.  *See* Yushkin Report at 4.  This conclusion is flawed for three reasons.  First, it completely ignores the possibility that Russian authorities did not, in this case, follow their own protocol.  Second, it disregards the undisputed evidence that SASCO issued a Correction Advice to supplement the SASCO Transit Bill, that Trans-Net issued an amended Trans-Net Bill of Lading showing I.P. Ushtykov V.A. as consignee, and that the revised Trans-Net Bill of Lading was forwarded by NEI to the new consignee.  *See* Larchenko Decl. at ¶ 4 & Exh. A; Ionitsa Decl. at ¶ 18.  Third, it contradicts the undisputed custom and usage of the P-K Port.  As indicated in the record, only one original SASCO Transit Bill existed, and the SASCO Transit Bill could only be released by Mr. Semenov in exchange for an original Trans-Net Bill of Lading, which only a legitimate consignee would possess.  Thus, contrary to the experts' conclusion, the SASCO Transit Bill could not also be revised and given to Russian officials as evidence or notification of the correct consignee.  Finally, to the extent NEI or its experts assert that Trans-Net was required to inform Russian customs or P-K Port officials about a change in consignee, they fail to cite any provision of U.S. or Russian law for support. Although Article 149 of the Merchant Shipping Code of the Russian Federation, to which NEI's experts refer, allows a consignor to change the consignee prior to delivery and to dictate the disposition of the cargo, it imposes no duty on the carrier to advise governmental authorities about any such modifications.  *See* Exh. 1 to Yushkin Report.

ORDER - 7

goods covered by a bill of lading to (1) a person entitled to their possession, (2) the consignee named in a nonnegotiable bill, or (3) a person in possession of a negotiable bill if the goods are deliverable to the order of that person or the bill has been indorsed to that person or in blank. 49 U.S.C. § 80110(b). For purposes of the Act, customs authorities are persons entitled to possession of such goods. *Ace Bag*, 40 F. Supp. 2d at 240. Thus, in turning the container of frozen pork over to Russian customs officials, Trans-Net complied with the statute. The Court GRANTS summary judgment in favor of Trans-Net as to NEI's claim under the Pomerene Bills of Lading Act, and DISMISSES NEI's third cause of action with prejudice.

## D.    **Breach of Contract**

The Court further HOLDS as a matter of law that Trans-Net fulfilled its contractual obligations under the Trans-Net Bill of Lading by delivering the container of pork into the custody of Russian officials. *See* Bill of Lading Terms & Conditions at ¶ 15, Exh. A to Ogle Decl. NEI has not identified any provision of the Trans-Net Bill of Lading that it asserts Trans-Net has breached. Indeed, NEI asserts that the Trans-Net Bill of Lading does not apply to the transaction at issue because, by its own terms, it governs only multi-modal transportation, which was not used in this case. *See* Response at 16 (docket no. 23); *see also* Exh. A to Ionitsa Decl. The Court interprets NEI's argument as a concession that it has no valid breach of contract claim.

Instead, NEI now appears to pursue a promissory estoppel theory, discussing at length Trans-Net's alleged representations about its expertise and NEI's reliance thereon. *See* Response at 12-14. NEI, however, did not plead promissory estoppel, *see* Amended Complaint, and its failure to assert such theory in a timely manner precludes its current arguments. Even if NEI could raise such claim, the Court is persuaded that NEI could not prevail. To prove promissory estoppel, NEI must establish that Trans-Net made a promise, upon which it reasonably expected NEI to rely, and upon which NEI did justifiably rely in

such manner that injustice can be avoided only by enforcement of the promise. *Uznay v. Bevis*, 139 Wn. App. 359, 369-70, 161 P.3d 1040 (2007). Although NEI describes a number of representations made on Trans-Net's website, it identifies no specific promise made by Trans-Net regarding the container of pork at issue. To the contrary, the record indicates that Trans-Net disclaimed any ability to protect the container, warning that the matter might "be taken out of our hands by Russian customs if the cargo is arrested" and strongly suggesting to NEI that it "take action." Exh. C to Ogle Decl. Moreover, any reliance NEI might have placed on Trans-Net in light of the circumstances was not, as a matter of law, justified. The Court GRANTS summary judgment in favor of Trans-Net as to NEI's breach of contract claim, as well as NEI's unpleaded promissory estoppel claim, and DISMISSES NEI's fourth cause of action with prejudice.

**Conclusion**

For the foregoing reasons, defendant Trans-Net, Inc.'s motion for summary judgment is GRANTED, and plaintiff New Edge International, LLC's claims are DISMISSED with prejudice. The Clerk is directed to enter judgment accordingly and to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

DATED this 28th day of December, 2009.


Thomas S. Zilly
United States District Judge

ORDER - 9